IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BEE THAO,

        Plaintiff,                    No. CIV S-07-1486 EFB

    vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.              ORDER
_____/

    Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). For the reasons discussed below, the court grants plaintiff's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands this case for further development of the record.

I. BACKGROUND

    Plaintiff, born July 1, 1983, applied for SSI on September 22, 2004, alleging disability since January 2002, due to "hearing disable, learning disable, memories disable, temper and appetites problem." Administrative Record ("AR") 43-48, 50; *but see* AR 43, 59 (alleging disability since June 1, 1987). With the assistance of his aunt in completing the application, AR 58, plaintiff stated that he last worked January 2001, but had to stop working because he had no

1

transportation. AR 50.  He stated that he last worked as a "cashier" at a McDonald's restaurant, with the following responsibilities: "[T]ake orders a few time[s] a day (sometimes), [] flick burgers, make burgers, clean windows, chairs, tables, floors and restrooms most of the time." AR 51.  He also stated that "other employees would help me clean the tables and wash dishes." AR 50.  In responding to the inquiry, "Check the highest grade of school completed," plaintiff checked both grades 11 and 12, with "2000" as the date completed; he answered "yes" to the question, "Did you attend special education classes?" and identified the school as "Community Day – Special School for Disabled Persons, 7000 Franklin Blvd. #820, Sacramento CA 95823." A telephone number is provided.  AR 56.

The Social Security field officer made the following observations upon accepting plaintiff's application: "The claimant spoke very little, he was not able to answer much of anything.  He did not know the year he stop[ped] school, what grade he was in when he last attended school, after asking several questions different ways he was able to tell me he washed tables and dishes."  AR 60.

At the December 14, 2006 hearing before administrative law judge ("ALJ") Joseph DiPietro, at which plaintiff was represented by counsel, plaintiff testified that he last worked, for a period of two to three months, at a McDonald's restaurant.  AR 187.  He earned $10,000 from 2001 to 2002.  AR 187-188.  His duties were "mostly" taking out the trash and doing the dishes, but he helped a little placing orders and with the cash register.  AR 193.  Plaintiff got the job through a friend and did not need to complete a formal application.  AR 193-194.  Plaintiff's dad would drive him to work; his mom would pick him up.  AR 192.  Plaintiff left the job because he and his family moved.  AR 192-193.

Plaintiff testified that he does not have a driver's license, although he attempted the written test.  AR 190, 195.  Plaintiff stated that he completed his freshman year in high school, but then quit school because it was complicated.  AR 190, 195.  Plaintiff testified that he can read and write a little in English, but does not read another language.  AR 190-191.

2

Plaintiff testified that he helps his parents at their convenience store, two to three days a week, cleaning and stocking shelves. He also helps at their laundromat. AR 188-190. Sometimes plaintiff stays home to "open the door for my brothers when they get home from school." AR 191. He stated that his brothers are younger, that he babysits them when his parents aren't home, but "[t]here's other people there that help me." AR 191. Plaintiff testified that he likes coloring with his five-year old niece, and playing video games with his brothers, age seven and eight or nine, but they argue about everything. AR 194.

Plaintiff testified that he cares for himself with respect to bathing and eating, but relies on reminders from his mom. He stated that he can cook a little bit, and makes peanut butter sandwiches. AR 195-196. Plaintiff could not identify his home address when asked by the ALJ. AR 197.

At the conclusion of the hearing, plaintiff's counsel was permitted to make the following offer of proof regarding the testimony of plaintiff's mother (AR 196-197):

> [M]other would testify that he's had developmental problems since being a young child. Was noticed even amongst, when he was smaller, he had to be controlled. He would run out into the street, that sort of thing, and they, of course, had to watch him for his own safety. Since that time, he still functions at a level, in their mind, more consistent with his brothers, who you've heard him testify as fighting and playing with and that sort of thing, rather than more of, than an adult level. His job was accomplished through a friend and the reason they stopped, stopped working was because they would of course, have to drive him to and from work everyday. It was more of an accommodation than a regular job. At this time, he is still functioning at that level. Their hope is to get him into some sort of Alta (Phonetic) Regional or some sort of rehab program so [he] can learn independent skills in the next, so that at some point, he can be independent. . .

After the hearing, the ALJ left open the record to obtain the report of psychologist Michelina Regazzi. AR 186-187.

////
////
////
////

3

The ALJ issued a decision on September 17, 2005, finding that plaintiff is not disabled.[1]
AR 14-22. The ALJ made the following findings:

> 1. Mr. Thao has not engaged in substantial gainful activity since September 22, 2004.
>
> 2. The medical evidence establishes that Mr. Thao has severe impairments due to borderline intellectual functioning and a learning disorder, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.
>
> 3. Mr. Thao's allegations of disability are not fully credible for the reasons set forth in the above decision, and are not supported by medical evidence contained in the record.
>
> 4. Regarding Mr. Thao's residual functional capacity, he is limited to the performance of unskilled, entry-level work involving simple, routine tasks. There are no exertional limitations (20 CFR 416.945).

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq*. Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq*. Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n. 5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen*, 482 U.S. at 146, n. 5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

5. Mr. Thao's past relevant work as a fast food worker, as he performed it, and as performed in the economy, did not require the performance of the work-related activities precluded by the above limitation (20 CFR 416.965).

6. Mr. Thao's impairments do not prevent him from performing his past relevant work.

7. Mr. Thao has a limited education (20 CFR 416.964).

8. In view of Mr. Thao's age and residual functional capacity, the issue of transferability of work skills is not material.

9. Mr. Thao's nonexertional limitations do not significantly compromise his ability to perform work at all exertional levels, except performing more than unskilled entry-level work; therefore, section 204.00, Appendix 2, Subpart P, Regulations No. 4, and Social Security Ruling 85-15 indicate that a finding of nor disabled would be appropriate.

10. Considering the range of work at all levels which Mr. Thao is functionally capable of performing, in consideration with his age, education and work experience, he can be expected to make a vocational adjustment to work which exists in significant numbers in the national economy. Social Security Rulings 85-15 and 83-10 support this finding.

11. In the alternative, based on the framework of Section 204.00, Appendix 2, Subpart P, Regulations No. 4, in conjunction with Social Security Ruling 85-15, it is found that a significant number of jobs exist that Mr. Thao can perform based on a capacity for unskilled work and considering his age, education and work experience.

12. Mr. Thao was not under a "disability," as defined in the Act, at any time through the date of this decision (20 CFR 416.920(f)(g)).

AR 21-22.

On May 25, 2007, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. AR 5-7.

II. ISSUES PRESENTED

Plaintiff contends that: (1) the ALJ erred in failing to find that plaintiff's mental impairment meets the criteria for Listing 12.05C; and (2) alternatively, that in failing to secure the services of a vocational expert, the ALJ failed to show that plaintiff could perform substantial gainful activity that exists in significant numbers in the national economy.

////

The court does not resolve either contention but, upon considering the first, remands this case for further development of the record and the ALJ's reconsideration of plaintiff's allegations. This result is required by the Commissioner's failure to consider plaintiff's participation in a special education program, a matter of particular significance in the ALJ's written decision. The ALJ accorded substantial weight to the erroneous finding that plaintiff had never been enrolled in special education classes.

III. LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

IV. NONMEDICAL EVIDENCE

Plaintiff submitted his report card for grades seven through nine. AR 130-31. In grades seven and eight, plaintiff's overall grade point average ("GPA") was 1.45; he was ranked 318 in

a class of 394. AR 131. In ninth grade, plaintiff's overall GPA was 0.81, and he ranked 541 in a class of 649. AR 130.

V. <u>MEDICAL EVIDENCE</u>

    A. <u>ERNEST E. JOHNSON, M.D.</u>

On February 24, 2005, Ernest E. Johnson, M.D., of Sacramento Ear, Nose and Throat, examined plaintiff's hearing, based on plaintiff's complaints that sounds seemed "muffled or distant" and conversations difficult to understand. AR 150-52. An audiogram showed hearing loss in the left ear at 25 decibels, and 20 decibels in the right ear, AR 151, but plaintiff was able properly to discriminate speech at normal speaking levels at 96% in the right ear and 100% in the left, AR 151, 152. Dr. Johnson concluded that plaintiff has "[b]ilateral, mild conductive hearing loss" but can hear "at a socially adequate level." AR 151. Dr. Johnson opined that plaintiff did not require hearing aids, was not a candidate for surgery, and that his hearing loss was probably permanent and stationary. *Id.*

    B. <u>BARRY N. FINKEL, PH.D.</u>

On February 11, 2005, at the request of the Commissioner, psychologist Barry N. Finkel, Ph.D., conducted a consultative examination of plaintiff. AR 141-44. Plaintiff told Dr. Finkel that he lives with his parents and siblings; that he is the third of nine siblings; that he has never been married but has a one year old son; that he dropped out of school in eleventh grade and was not in special education classes; that he last worked at McDonald's four years earlier for six or seven months. AR 141. Plaintiff stated that on a typical day he awakes between 7:00 a.m. and noon, showers, dresses, spends the day with his siblings or playing video games, and that his chore consists of cleaning the yard. *Id.* Plaintiff stated that he has a few friends outside the family, and that they play video games together or go to the movies. Plaintiff stated that he goes to bed around 11:00 p.m. and sleeps well. *Id.*

Dr. Finkel found plaintiff's presentation and behavior within normal limits, noting that he was carefully groomed, polite and cooperative, and put forth adequate effort; thus, the results of

testing appeared to be a valid measure of present functioning. AR 143, 142.

Administration of the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III") provided the following overall results: Verbal IQ of 74, Performance IQ of 72, and Full-scale IQ of 70. AR 142. Dr. Finkel noted results of 59 to 68 in tests of immediate and working memory. *Id*. Dr. Finkel further noted that, "Trails A was completed in 85 seconds, indicative of marked visuomotor impairment. The claimant was unable to complete Trails B. Reproduction of Bender designs showed mild distortion, simplification, and closure difficulty. There were no indicators of organic impairment." AR 143.

Dr. Finkel made the following diagnoses pursuant to the American Psychiatric Association's multiaxial framework (AR 143):[2]

> Axis I: No diagnosis or Condition
> Axis II: Borderline Intellectual Functioning
> Axis III: Hearing loss in left ear
> Axis IV: Mild
> Axis V: GAF 65

Dr. Finkel summarized his findings in part (AR 143):

Overall intellectual functioning is in the borderline range with no significant difference between verbal and performance scores. A relative strength is in attention span. On the WMS-III, auditory immediate and visual strength memories are in the extremely low range. Immediate memory (derived from auditory immediate and visual immediate memory scores) is in the extremely low range. Working memory is extremely low. Performance on screening measures

---

[2] The American Psychiatric Association's Multiaxial Assessment is set forth in the Diagnostic and Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th ed. 1994), at pp. 25-33:

> Axis I: Clinical Disorders
> Other Conditions That May Be a Focus of Clinical Attention
> Axis II: Personality Disorders
> Mental Retardation
> Axis III: Medical Conditions
> Axis IV: Psychosocial and Environmental Problems
> Axis V: Global Assessment of Functioning ("GAF").

The GAF Scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Id.* at p. 34.

8

> is consistent with cognitive limitations. . . . Cognitive ability generally is in the low borderline range which would be consistent with reports of leaning and memory problems. . . . The claimant is able to groom and dress himself appropriately. He can follow simple instructions only. He should be able to attend to and follow through on simple tasks without direct supervision. He should be able to interact appropriately with other including supervisors and peers. Attention span is within normal limits. Concentration and pace are moderately impaired. His ability to work over an eight-hour day and attend to a regular work schedule is mildly to moderately impaired. He is competent to manage funds.

Dr. Finkel completed a Mental Residual Functional Capacity Assessment form, in which he found "moderate" limitations in plaintiff's ability to understand and remember detailed instructions, and the ability to carry out detailed instructions. All other functional capacities were found "not significantly limited." AR 146-147.

### C. MICHELINA REGAZZI, PH.D.

On October 31, 2006, at the request of plaintiff's counsel, plaintiff was evaluated by psychologist Michelina Regazzi, Ph.D. AR 173-180. Dr. Regazzi reviewed Dr. Finkel's report, conducted a clinical interview of plaintiff, and administered the Wide Range Achievement Test - 4th Edition ("WRAT-4"). Plaintiff stated to Dr Regazzi that he lives with his parents and younger siblings; that he has a one year old son who lives with his mother, and plaintiff sees him sometimes; that plaintiff does not have a girlfriend, but has other friends; that plaintiff plays on the computer, and likes video games. AR 174. Plaintiff stated that he dropped out of school in the ninth grade, that the work was difficult and he did not understand it, and that he did not think he was in special education classes. *Id.* Plaintiff stated that when he was 17, he worked at McDonald's for two or three months; that he left "because his family moved and he did not have transportation to get there;" and that he "does not know why he cannot get another job." *Id.* Plaintiff reported that he wakes up at 11:00 a.m.; does chores of taking out the trash and cleaning his room; does not cook, use the stove or microwave, his sisters usually cook for him; does not go shopping because "his family takes care of it;" "does not know if he gets confused when counting change as he does not count change in the store;" and does not have a driver's license

because he can't pass the test. *Id.*

Dr. Regazzi noted that plaintiff "had a depressed countenance," but plaintiff reported that his predominant mood was "bored." AR 175. Dr. Regazzi found plaintiff cooperative and he appeared to perform to the best of his ability. *Id.* The results of the WRAT-4 test demonstrated that plaintiff's "academic scores all fell within the deficient range. He could not read or write. He could not recognize some of the letters of the alphabet. He could not write some of the letters of the alphabet." *Id.* Dr. Regazzi opined that in addition to having borderline intellectual functioning, plaintiff has a learning disorder as well, based on his "inordinately low" academic scores. AR 176. Dr. Regazzi made the following diagnoses pursuant to the American Psychiatric Association's multiaxial framework (AR 175):

| | |
|---|---|
| Axis I: | 315.9 Learning Disorder, NOS |
| Axis II: | Borderline intellectual functioning |
| Axis III: | None, by report |
| Axis IV: | Unemployment, lack of income. |
| Axis V: | GAF 65. |

Dr. Regazzi opined that plaintiff has "moderately severe" impairments in his daily living skills, and would "need assistance with carrying out any tasks that require reading and writing, such as handling correspondence, making appointments, reading instructions, and completing forms." AR. 176. Dr. Regazzi also found "moderately severe" impairments in plaintiff's social functioning; that while he "is able to interact appropriately in a one-to-one setting," "[i]n a work setting, his social skills would likely be inadequate. In comparison to his peers, he is delayed socially." *Id.* Dr. Regazzi found "severe" impairments in plaintiff's ability for sustained concentration, persistence, and pace, due to his low cognitive and academic skills. *Id.* Finally, Dr. Regazzi found that plaintiff's ability to adapt to a work setting was circumscribed as follows:

> [Plaintiff] has low intelligence and cannot be expected to learn at the rate of his peers. He would need a lot of instruction when learning new tasks. He could carry out simple, rote tasks in an environment that is moderately supervised until he has learned the tasks. He can be expected to have difficulty understanding verbal instructions unless they were simple and brief.

*Id.*; *But see*, AR 180 (Questionnaire in which Dr. Regazzi found "severe" limitations in (1)

10

plaintiff's ability to comprehend and follow instructions, (2) perform work requiring frequent contact with others, (3) perform simple tasks in a full-time work setting, and (4) perform complex tasks in a full-time work setting; and (5) finding "moderately severe" limitations in plaintiff's ability to perform work where contact with others will be minimal).

## C. STATE AGENCY REVIEWS

On March 2, 2005, Social Security Administration medical consultant David Pong, M.D., completed a Psychiatric Review Technique form, and concluded that plaintiff may have an organic mental disorder (citing Listing 2.02, but noting that plaintiff does not meet the "C" criteria), but his residual functional capacity should be assessed. AR 153-166, 169-170. Dr. Pong noted that plaintiff appeared to have no restrictions in his activities of daily living, mild restrictions in his ability to maintain social functioning, moderate limitations in maintaining concentration, persistence or pace, and insufficient evidence of episodes of decompensation. AR 163. Dr. Pong concluded that plaintiff can perform simple, routine tasks ("SRTs") "at least." AR 170.

On August 9, 2005, State Agency physician Dr. Joseph Schnitzer, M.D., concurred with Dr. Pong's assessment. AR 153, 167-168.

## VI. THIRD PARTY STATEMENT

Plaintiff's sister, Jennifer Thao, filed a "Function Report -Adult Third Party." AR 70-78. Ms. Thao stated that she lived with plaintiff, and that "[m]ost of the time he watches TV and sleep[s]," and also "wonder [sic] around the house doing nothing." AR 70. He requires daily reminders to bathe and groom himself, and to keep appointments, and does not prepare his own meals "[b]ecause he either overcook or burn his meal unless someone always there to remind him." AR 71-72, 77. Ms. Thao stated that plaintiff needs help with all chores, like doing his laundry, ironing his clothes, yard work, doing the dishes, putting away his clothes and personal belongings, vacuuming, using the washing machine, lawn mower, VCR and DVD; that "when he do chores around the house, it take him the whole day;" and "someone alway[s] have to do it

again after he finished." AR 72-73, 77, 78. Plaintiff twice failed his driver's exam; he cannot handle money or finances. AR 73-74. Plaintiff visits with friends a couple of times a week; they watch TV or hang around; plaintiff sometimes goes to church with his family; he shops once or twice a month. AR 74, 73. Ms. Thao described plaintiff as being "born with learning disable, thinking disable, understanding disable and hearing disable all his life." AR 75; *see also* AR 74. Most impacted are his abilities to hear, understand, follow instructions, complete tasks, remember and concentrate. AR 75. Additionally, Ms. Thao stated that "[w]hen people want to say something to [plaintiff ], they have to said it out loud and look into his eye to make sure that he hear them well. Also tapping his shoulder for conversation is very necessary." AR 77.

VII. DISCUSSION

Plaintiff initially contends that the ALJ erred in failing to find that plaintiff's mental impairment meets the criteria for Listing 12.05C.

The Social Security Regulations' "Listing of Impairments" sets forth impairments and combinations of impairments that are so severe as to be considered presumptively disabling, without further consideration of a claimant's residual functional capacity, past relevant work, or other jobs.. 20 C.F.R. §§ 404.1520(d), 416.920(d); *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990). In order for a claimant's impairment(s) to meet or equal a listed impairment, all of the requirements of that listing must be met. *Key v. Heckler*, 754 F.2d 1545, 1550 (9th Cir. 1985).

Category 12.05, 20 of the Listing of Impairments, C.F.R., Appendix 1, Part 404, Subpart P, Regulations No. 4, sets forth the criteria for finding a claimant presumptively disabled based on mental retardation or autism.[3] To support a finding of disability under Listing 12.05C, the

---

[3] Listing 12.05 provides in pertinent part:

Listing 12.05: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22). (Note: The scores specified below refer to those obtained on the WAIS, and are used only for reference purposes. Scores obtained on other standardized and individually administered

12

claimant must demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before the age 22)," and a "valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Plaintiff does not contend that he has an additional physical impairment (i.e., he does not refute the ALJ's finding that plaintiff's hearing loss is nonsevere), but that his additional mental impairment, a learning disorder, together with his borderline intellectual functioning, result in additional and significant work-related limitations that meet the criteria of Listing 12.05C.

The ALJ found that plaintiff has "a severe impairment as a result of borderline intellectual functioning and a learning disorder," AR 15. The ALJ acknowledged that the

---

tests are acceptable, but the numerical values obtained must indicate a similar level of intellectual functioning.) . . .

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
Or

B. A valid verbal, performance, or full scale IQ of 59 or less;
Or

C. A valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

Commissioner's consultative examiner, psychologist Barry Finkel, Ph.D., found that plaintiff's full scale WAIS score was 70, thus meeting the threshold objective requirement of Listings 12.05C and 12.05D.[4] AR 15. The ALJ also implicitly acknowledged that plaintiff's mental impairment was developmental (manifested before age 22). However, the ALJ found that plaintiff did not exhibit the requisite "deficiencies in adaptive behavior . . . of the magnitude required by Listing 12.05C," i.e., that "the severity of Mr. Thao's impairments does not meet or equal the level of dysfunction described in the 'C' criteria." *Id.* The ALJ reasoned:

> *The record shows that Mr. Thao has not received special education services* and worked as a fast food worker at the substantial gainful activity level in 2001, earning $10,823.95. He is independent in his personal hygiene skills. He performs such chores as cleaning the yard, taking out the trash and cleaning his room. He baby-sits his brothers and plays video games with his brothers. He spends time with his one year old son. He helped his parents two or three times a week at their convenience store. He uses a computer and plays video games. He attends church services with his family.

AR 15-16 (emphasis added).

The ALJ's reasoning required, in part, rejection of Dr. Regazzi's report in favor of Dr. Finkel's report. Since plaintiff neither submitted nor referenced any evidence from treating physicians,[5] the ALJ was limited to considering the contradictory consultative psychological reports of Drs. Finkel and Regazzi. To reject the opinion of one of these examining professionals, the ALJ was required to provide "specific and legitimate" reasons supported by substantial evidence in the record.[6] *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The ALJ

---

[4] The ALJ found that plaintiff does not have an impairment or combination of impairments that meet Listing 12.02 (organic mental disorders). Despite the conjecture of the State Agency Physician, AR 153, Dr. Finkel found no evidence of organic impairment, AR 143, and no other evidence of record appears to support such a finding.

[5] Requests for information from plaintiff's regular medical provider, Kaiser, were returned for lack of evidence for the period requested, October 2002 to present. AR 134-140.

[6] Even Dr. Finkel opined that plaintiff's immediate memory "is in the extremely low range" and that his working memory "is extremely low." AR 143. He also observed that [p]erformance on screening measures is consistent with cognitive limitations. . . . Cognitive

14

found that Dr. Finkel's report better reflected the record as a whole, and rejected the "extreme limitations" found by Dr. Regazzi as "not supported by clinical findings, the results of her examination, and they are inconsistent with the record as a whole." AR 19. The ALJ reasoned in part[7]:

> Although this examiner [Dr. Regazzi] reported that Mr. Thao could not read or write, the record shows that *he has never been enrolled in special education classes,* and received grades of "B" in history and geography and grades of "C" in pre-algebra, world history, and mathematics, which are inconsistent with an inability to read and write. (Exhibit 5E). Further, the record shows that Mr. Thao spends time at the computer, plays video games, and works a few days a week at his mother's store. Further, despite the extreme mental functional limitations, she assessed his Global Assessment of Functioning (GAF) as 65 under the Axis V finding, which is indicative of only mild mental limitations.[8]

*Id.* (emphasis added).

The ALJ makes two more references to the absence of special education classes, in his summaries of the reports of Dr. Finkel and Dr. Regazzi. AR 16, 17.

The ALJ's repeated reliance on the absence of special education classes demonstrates the importance of this factor in assessing whether plaintiff's impairments meet the criteria for Listing 12.05C and, if the sequential analysis proceeds to the next step, in assessing his residual functional capacity. Indeed, the issue of whether plaintiff was placed in special education is highly significant to the question of whether plaintiff's limited metal functioning meets or is

---

ability generally is in the low borderline range which would be consistent with reports of leaning and memory problems." *Id.*

[7] An additional reason the ALJ favored Dr. Finkel's report is unsupported for other reasons. The ALJ stated that he gave "significant evidentiary weight to the comprehensive and detailed report of Doctor Finkel . . . because of his expertise, training and special knowledge in the field of psychology, and whose findings are based upon psychological testing and objective findings." AR 19. Since both Dr. Finkel and Dr. Regazzi are licensed psychologists, without other indicia of specialized expertise, and both conducted objective testing, this reason fails adequately to distinguish between the examiners and their reports.

[8] A GAF 61 to 70 denotes "Some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV, at p. 34.

15

medically the equivalent to that described in category 12.05C of the Listing of Impairments. However, the ALJ's finding that plaintiff never participated in special education classes – despite explicit evidence to the contrary – undermines the ALJ's reasoning and renders the record sufficiently ambiguous to require its further development on this matter. The Commissioner is not free to ignore pertinent references in the record, and this court may not overlook such significant matters on review. Here, it appears that the ALJ simply overlooked the specific statement in the record that plaintiff participated in the "Community Day – Special School for Disabled Persons, 7000 Franklin Blvd. #820, Sacramento CA 95823." AR 56. Indeed, plaintiff himself did not appear to understand what "special education" classes meant and was unable to tell the consultative examiners that he, in fact, attended such classes. This very limited level of understanding by plaintiff is consistent with the observations of the Social Security Claims Representative who expressly noted in the file that:

> The claimant spoke very little, he was not able to answer much of anything. He did not know the year he stop[ped] school, what grade he was in when he last attended school, after asking several questions different ways he was able to tell me he washed tables and dishes.

AR 60. It is also consistent with the observation by Dr. Regazzi that plaintiff could not read or write, nor could he write or even recognize some of the letters of the alphabet. AR 176

An ALJ's duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). "The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citations and internal quotations omitted). This duty is heightened where the claimant may have a mental illness and thus be unable to protect his own interests. *Id.; see also Crane v. Shalala*, 76 F.3d 251, 255 (9th Cir.1996) (ALJ has duty to develop the record even when claimant is represented); *and Smolen*, 80 F.3d at 1288 (where there is some objective evidence suggesting a condition

16

which could have a material impact on the disability decision, the ALJ must further investigate). The record here reveals a mentally impaired individual who is generally dependent upon others. Whether he did or did not attend special education is an issue of some prominence in the analysis and ultimate decision by the ALJ. The discrepancy in the record in this regard must be developed and resolved.

Accordingly, this case will be remanded for further development of plaintiff's participation in special education classes, and reconsideration of plaintiff's allegations in light of a complete record.

On remand, the Commissioner shall also expressly consider the third party statement of plaintiff's sister. AR 70-78. Although the ALJ referenced this report in his decision, *see, e.g.*, AR 18, 19, 20, such consideration analysis must be explicit and, if the statement is discredited, must set forth reasons that are germane to the witness. *Dodrill v. Shalala*, 12 F.3d 915, 918-919 (9th Cir. 1993).

VIII. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment, Dckt. No. 20, is granted;

2. The Commissioner's cross-motion for summary judgment, Dckt. No. 23, is denied;

3. This case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. 405(g), for further proceedings consistent with this order; and

4. The Clerk is directed to enter judgment in favor of plaintiff.

DATED: March 30, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE